IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 2:24-cr-00764-BHH-2 |
| | ) | |
| vs. | ) | |
| | ) | |
| **AHMED FATHY SHEDID** | ) | |
| | ) | |

**DEFENDANT AHMED FATHY SHEDID'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD DEPARTURE / VARIANCE**

The Defendant, Ahmed Fathy Shedid, by and through his undersigned counsel, hereby

moves for a downward departure and variance from the Guideline range calculated under the U.S.

Sentencing Guidelines – which is the statutory maximum for his offense. As discussed more fully

herein, Mr. Ahmed Shedid and his brother and co-defendant, Ibrahim Shedid, (1) expected to re-

ceive only a fraction of the pills seized because an unindicted co-conspirator inflated an order

without his knowledge or consent, resulting in a six-point offense level increase[1]; (2) the low end

of Mr. Ahmed Shedid's advisory Guideline range is nearly three years higher than the national

average for similarly situated defendants even *before* any adjustment to reflect the actual counter-

feit pills for which he is responsible; and (3) Mr. Ahmed Shedid is a co-primary caretaker of a

disabled brother, Shedid Fathy Shedid, who suffers from debilitating multiple sclerosis. For these

and other reasons discussed herein, the statutory maximum is greater than necessary to comply

with the purposes of sentencing.

Mr. Ahmed Shedid respectfully submits this Motion and Memorandum in order to provide

information to assist the Court in fashioning a sentence "sufficient but not greater than necessary"

---

[1] Ibrahim Shedid's polygraph has confirmed his actual order.

to achieve the statutory purposes of sentencing, as required by 18 U.S.C. § 3553(a) in light of

*United States v. Booker*, 543 U.S. 220 (2005).

## TABLE OF CONTENTS

I.    Introduction ................................................................................................................... 5

II.   Factual and Procedural History ..................................................................................... 6

     A.    Investigation and charges ................................................................................. 6

     B.    Guilty plea, stipulation, and advisory Guideline range ............................................. 6

III.   Argument ....................................................................................................................... 8

     A.    A substantial downward departure is appropriate because Mr. Ahmed Shedid's loss amount is based upon a grossly inflated neither he or Ibarhim Shedid made and his offense level thus substantially overstates the seriousness of his offense ........................... 8

     B.    Mr. Ahmed Shedid's role as the primary caretaker for his disabled brother makes him an indispensable part of his brother's care and a departure on the basis of familial responsibility is warranted under U.S.S.G. § 5H1.6 ...................................................... 10

     C.    Because combined mitigating circumstances, including Mr. Ahmed Shedid's circumstances related to loss and the need to assist in his brother's care, make the case an exceptional one, a downward departure should be granted based on U.S.S.G. § 5k2.0(c) ...................................................................................................... 13

     D.    Even if the Court determines that the Guidelines do not support a downward departure, a variance from the Guideline range is warranted based on a consideration of the sentencing factors under 18 U.S.C. § 3553(a) .......................................................... 14

         1.    A variance is justified based on application of the § 3553(a) factors and the directive that a sentence be "sufficient but not greater than necessary" ....... 14

         2.    § 3553(a)(1): A variance is appropriate based on Mr. Ahmed Shedid's history and characteristics, specifically his role as primary caretaker for his brother .......................................................................................................... 16

         3.    § 3553(a)(1): A variance is appropriate based on the nature and circumstances of Mr. Ahmed Shedid's offense ........................................... 18

         4.    § 3553(a)(2)(A): A substantial variance reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense ....................................................................................................... 19

         5.    § 3553(a)(2)(B): A substantial variance affords adequate deterrence to criminal conduct .......................................................................................... 20

         6.    § 3553(a)(2)(C): A substantial variance protects the public from further crimes of the defendant ............................................................................... 21

         7.    § 3553(a)(3): A substantial variance is appropriate given the kinds of sentences available .................................................................................... 21

         8.    § 3553(a)(4): A variance is appropriate given the kinds of sentences and the sentencing range established for the applicable category of offense committed by the defendant as set forth in the Guidelines ........................... 21

9. § 3553(a)(5): Pertinent policy statements issued by the Sentencing Commission support a substantial variance .................................................. 22

10. § 3553(a)(6): Failure to grant a variance would create unwarranted sentencing disparities ................................................................................. 22

IV.  Conclusion ........................................................................................................... 23

## I.     Introduction

The case comes before the Court following Mr. Ahmed Shedid's guilty plea to conspiracy to traffic in counterfeit Viagra, in violation of 18 U.S.C. § 371. Mr. Ahmed Shedid, a dedicated father and husband who has 0 criminal history points and now faces the statutory maximum for his offense, admits his wrongdoing in this matter and has fully accepted responsibility for his actions and the impact they have had on his family and community. His genuine remorse is evidenced by the fact that, unlike many defendants, Mr. Ahmed Shedid accepted responsibility immediately, hired attorneys and opened a dialogue with the Government within two days of receiving a target letter.

He submits this Memorandum to assist the Court in determining an appropriate sentence given that the loss amount in his current case grossly overstates his actual culpability, [2] especially given that his brother passed a polygraph regarding the intended order and the seized pills were never put into commerce. Additionally, as is referenced in the PSR (PSR at ¶63), Mr. Ahmed Shedid is the primary caretaker for his brother, whose health is deteriorating rapidly due to multiple sclerosis ("MS"). *See* **Medical Records, attached as Ex. A.** Mr. Ahmed Shedid spends a substantial amount of time caring for his brother, and attends to his needs every day. Mr. Ahmed Shedid is also facing a statutory maximum sentence that is nearly double the national average for similarly situated defendants even when considering all the pills seized. For these and the other reasons set forth and explained below, and such other reasons as may be presented at the sentencing hearing,

---

[2] Rather than object to the loss amount, Mr. Ahmed Shedid is instead seeking a downward departure or a variance. However, it is worth noting that at least one circuit court has vacated a sentence in a counterfeiting case where the district court applied a 22-level enhancement based on the total value of counterfeit items seized without proof that the defendant intended to sale the seized items. *United States v. Kirschner*, 995 F.3d 327, 336 (3d Cir. 2021). Specifically, the Third Circuit held that "the principal question is not whether [the defendant] could have sold the high-value counterfeits" that were seized; the "question is whether he intended to." *Id.*

Mr. Ahmed Shedid respectfully requests that the Court grant a substantial downward departure or variance in this case. Mr. Shedid also respectfully requests that any term of confinement be staggered with that of his co-defendant and brother, Ibrahim, so that one may be available to take care of their brother.

## II.    Factual and Procedural History

### A.    Investigation and charges

Sometime in 2023, law enforcement began investigating counterfeit Viagra in the North Charleston area. On January 25, 2024, Homeland Security Investigations ("HSI") was notified by a local postal facility that a box had fallen and "broke open" in the rear of a delivery vehicle, and that suspected counterfeit Viagra bottles had fallen out. Presentence Investigation Report ("PSR") at ¶ 24. HSI ultimately seized 9,401 bottles from the shipment, though the postal facility later recovered a box that had been missing from the original shipment that contained an additional 504 bottles. *Id.* at ¶¶ 25, 27. The bottles were headed to an address associated with a company for which Ibrahim Shedid, Mr. Ahmed Shedid's brother and co-defendant, was the registered agent. *Id.* at ¶ 24. HSI executed a search warrant at the company property and recovered 24 bottles of fake Viagra. *Id.* at ¶ 27. During a subsequent search of a rental unit belonging to Ibrahim Shedid, HSI uncovered an additional 273 bottles of counterfeit Viagra. *Id.* at ¶ 32.

### B.    Guilty plea, stipulation, and advisory Guideline range

On October 30, 2024, Mr. Ahmed Shedid pled guilty to Count 1 of an Information charging him and his brother Ibrahim Shedid with conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. § 371. *See* ECF Nos, 1 and 6. Specifically, he pled guilty to purchasing counterfeit Viagra for the purpose of selling the merchandise. *See id.*

6

On December 10, 2024, the U.S. Probation Office disclosed the PSR. The PSR noted that the vast majority of the counterfeit goods for which Mr. Ahmed Shedid was being held accountable stemmed from the single January 2024 order by his brother Ibrahim involving nearly 10,000 bottles of counterfeit Viagra. *See* PSR at ¶¶ 24–35. This order was never delivered. *Id*. at ¶ 24. Moreover, Mr. Ibrahim Shedid ordered only a fraction of what was actually shipped. Without Mr. Ibrahim Shedid's knowledge, an unindicted co-conspirator increased the order from less than 1,000 bottles to 9,905 bottles. Mr. Ibrahim Shedid has passed a polygraph examination wherein he stated that he intended to order – and did order – more than 90 percent less counterfeit Viagra than what was shipped to him. This report was provided during the investigation to the government and has been provided to the U.S. Probation Office. ***See* Polygraph Results, attached as Ex. B.** In fact, pursuant to the polygraph exam Mr. Ibrahim Shedid truthfully stated that he did not order more than 1,000 bottles of counterfeit Viagra overall. *Id*. Additionally, a substantially smaller January 2024 order – and an aggregate order of not more than 1,000 bottles – is far more reflective of the actual amount of counterfeit Viagra seized during searches of various locations related to this case.

As a result of the PSR valuing the amount of counterfeit material seized at more than $30 million, Mr. Ahmed Shedid received a 22-level enhancement. As a zero-point offender, the PSR calculated his criminal history category as 0, his total offense level as 27, and his advisory Guideline range as 70-87 months. *See* PSR at ¶¶ 50–61, 80. Given that the statutory maximum sentence was 60 months, the PSR reduced his advisory Guideline range to 60 months, which is the statutory maximum for his offense. *Id*. at ¶ 80.

7

III.    **Argument**

A.    **A substantial downward departure is appropriate because Mr. Ahmed Shedid's loss amount is based upon a grossly inflated order that he did not make and his offense level thus substantially overstates the seriousness of his offense**

Although § 2B5.3 of the U.S. Sentencing Guidelines is the starting point for determining the applicable advisory Guidelines in a counterfeiting case, if the infringement amount exceeds $6,500 a defendant is subject to an enhancement under the loss table in § 2B1.1. U.S.S.G. § 2B5.3(b)(1)(B). In turn, the application notes to § 2B1.1 make clear that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." U.S.S.G. § 2B1.1, App. Note 21(C).

Here, by including pills that Mr. Ibrahim Shedid never intended to order, the offense level in this case substantially overstates the seriousness of Mr. Ahmed Shedid's actual conduct. The current PSR holds him accountable for 10,202 bottles of counterfeit Viagra, consisting of 297 bottles seized during two separate searches and the 9,905 bottles that were shipped in January 2024 and never delivered. *See* PSR at ¶ 35. According to the PSR, each bottle is valued at $2,997.50, which creates a total loss amount of $30,580,903.08 – or a 22-level enhancement. *Id.* at ¶¶ 35, 51. However, as the polygraph confirms, Mr. Ibrahim Shedid ordered 1,000 bottles or less, which would include the pills seized during the search. ***See* Polygraph Results, attached as Ex. B.** Using the PSR's own per-bottle valuation, and even assuming Mr. Ibrahim Shedid ordered 1,000 (or even 1,100) bottles, this would result in a total loss amount of under $3.5 million – or a 16-level enhancement. *See* U.S.S.G. §§ 2B5.3(b)(1)(B), 2B1.1(b)(1)(I); PSR at ¶ 35. This six-level difference would bring Mr. Ahmed Shedid's advisory Guideline range from 70-87 months (or 60 months given the statutory maximum) to 37-46 months. *See* PSR at ¶ 80.

8

The Fourth Circuit has affirmed a downward departure under analogous circumstances in *United States v. Kalili*, 100 F. App'x 903, 904, 2004 WL 1336628 (4th Cir. 2004). In that case, two women deposited approximately $1,600 by way of a fraudulent check into the defendant's account, and the defendant used the funds. *Id*. at *904. The two women later deposited $800,000 worth of fraudulent checks. *Id*. However, the bank flagged the bad checks, notified authorities, and the defendant quickly entered a guilty plea and waived her right to an indictment. *Id*. The Fourth Circuit affirmed the district court's downward departure and found that holding the defendant accountable for the $800,000 "substantially overstated the seriousness of the offense." *Id*. at *905. "While [the defendant's] offense level was correctly increased to 17 based on an intended loss of over $800,000, it is clear that this was not an $800,000 case." *Id*.

Here, Mr. Ahmed Shedid is even more deserving of a downward departure than the defendant in *Kalili*. He, too, pled quickly, waived indictment, and had his loss based on a transaction that was detected and never realized. However, unlike the defendant in *Kalili*, he was not even aware of the substantially increased nature of the January 2024 order. In fact, the reasoning in *Kalili* would support an eight-level downward departure reflecting the entire amount of the January 2024 order, and it certainly supports a downward departure of at least six levels if not more. To borrow from the *Kalili* Court, *it is clear* that this is not a $30 million case.

A downward departure would also be in keeping with rulings from other courts to have examined similar issues. *See, e.g.*, *United States v. McBride*, 362 F.3d 360, 378 (6th Cir. 2004) (case remanded for district court to consider whether to depart downward under 2B1.1 where intended loss of over $1 million "substantially overstated" actual loss of $800); *United States v. Stuart*, 22 F.3d 76, 83 (3d Cir. 1994) ("Where application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence,

9

the district court should have the discretion to depart downward."); *United States v. Restrepo*, 936

F.2d 661, 667 (2d Cir. 1991) (concluding that downward departure may be warranted where the

offense level "bears little relation to the defendant's role in the offense"); *United States v. Kim*,

No. CR-07-170-S-BLW, 2008 WL 5054584, at *2 (D. Idaho Aug. 29, 2008) (determining that a

defendant was entitled to a six–level downward departure recommended by the Probation Officer

given that the offense level substantially overstated the seriousness of the offense); *United States*

*v. Oakford Corp*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 2000) (13-level departure granted where

offense level overstates gravity of offense as defendant personally was accountable for only a small

portion of $15 million loss); *United States v. Roen*, 279 F. Supp. 2d 986, 991 (E.D. Wis. 2003)

(departing nine levels downward and citing cases for the proposition that a downward departure is

appropriate where a defendant had a small role in causing the loss determined under the Guide-

lines). Accordingly, a downward departure of six to eight levels is appropriate under this ground

alone as the offense level here substantially overstates the seriousness of Mr. Ahmed Shedid's role

in the offense.

**B.**     **Mr. Ahmed Shedid's role as the co-primary caretaker for his disabled brother Shedid Fathy Shedid makes him an indispensable part of his brother's care and a departure on the basis of familial responsibility is warranted under U.S.S.G. § 5H1.6**

The U.S. Sentencing Guidelines allow for a departure based on the loss of caretaking or

financial support of a defendant's family. Specifically, Comment 1(B) to § 5H1.6 notes that a

departure based on familial responsibility is appropriate when the following factors are present:

(i)     The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)     The loss of caretaking or financial support substantially exceeds the harm ordinar-ily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or

suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)     The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's care-taking or financial support irreplaceable to the defendant's family.

(iv)     The departure effectively will address the loss of caretaking or financial support.

§ 5H1.6, cmt. 1(B)(i)-(iv).[3] Each if he factors are present here.

A Guideline sentence of the statutory maximum of 60 months will cause a substantial, direct, and specific loss of essential caretaking to Shedid which substantially exceeds the harm ordinarily incident to incarceration. Shedid suffers from severe MS, and was diagnosed with de-myelinating disease in December 2016 after he developed difficulty walking and diplopia. *See* **Medical Records, attached as Ex. A.** MRI imaging revealed the presence of periventricular and brainstem lesions, as well as several spinal cord lesions suggestive of MS. *Id.*

Shedid has since been treated at MUSC and was most recently seen on December 6, 2024. *Id.* Records from this date of service reflect the unfortunate development of enhancing lesions. *Id.* His symptoms had worsened and were characterized by difficulty walking, balance problems, and sensory changes. *Id.* He requires the use of a walker, needs help with feeding, and has difficulty holding a piece of paper due to weakness. *Id.* Treating doctors describe Shedid Fathy Shedid as suffering from a *"very disabling disease"* from which he has developed *"significant deficits."* *Id.* (emphasis added). The neuro range of systems include the following:

---

[3] The comment also requires the Court consider the seriousness of the offense, the involvement any family members, and the danger to family members as a result of the offense. § 5H1.6, cmt. 1(A), (B). As discussed more fully herein, this offense involved counterfeit goods, it did not involve violence, it caused no physical harm, and the pills at issue never made it into the stream of commerce. Further, there is no evidence that Mr. Ahmed Shedid's ill brother was involved in the offense and it posed no danger to him or Mr. Ahmed Shedid's family.

- Blurry vision;

- Brainstem/diplopia (worse with warm weather);

- Weakness in right hemibody (worse in leg);

- Sensory: right hemibody numbness;

- Balance problems - Mr. Shedid has suffered from several falls; and

- Memory changes.

The progressive nature of MS will, unfortunately, result in the worsening of his condition. *Id*. At this point he cannot work or drive. His family is seeking disability benefits on his behalf.

Although Mr. Ahmed Shedid's is married, his wife does not drive and Mr. Ahmed Shedid serves as his brother's primary caretaker and handles most of his brother's needs:

- Tending to him daily and assists him in performing basic tasks;

- Driving his brother to his therapy sessions three times per week and all doctor's appointments;

- Assisting in organizing a litany of medications and ensures medications are taken at the correct time and at the correct dosage;

- Paying for and picking up his groceries;

- Purchasing various medical equipment and supplies for his brother, including recently buying a wheelchair for him.

Certainly, Mr. Ahmed Shedid's brother is an extremely sick man and Mr. Ahmed Shedid is a crucial and indispensable part of his brother's medical care and financial support. Without a substantial departure, his brother will suffer the significant loss of these essential services. The extensive nature of his illness and needs also means that Shedid Fathy Shedid will suffer harm that far exceeds what is ordinarily incident to incarceration. *See* § 5H1.6, cmt. 1(B)(i)-(ii)

Additionally, no feasible substitute exists to remedy the harm that a statutory maximum sentence would inflict on Shedid Fathy Shedid. Although the possibility exists that someone else

may step into Mr. Ahmed Shedid's shoes after he is sentenced, unfortunately no such familial arrangements are likely to occur. The best, and perhaps only way to effectively mitigate and address this loss of caretaking and financial support is through a substantial downward departure. *See* § 5H1.6, cmt. 1(B)(iii)-(iv).

This is precisely the type of situation where district courts within the Fourth Circuit have granted departures. In *United States v. Colp*, 249 F. Supp. 2d 740, 745 (E.D. Va. 2003), the court noted that unlike cases where courts had denied a downward departure, the case at bar had "exceptional medical situations that exacerbated the family's potential hardship." Specifically, the district court granted a downward departure because the defendant was the caretaker for her disabled husband, who required constant attention due to seizures and limited mental and physical capabilities. *Id.*

It is also worth noting that Mr. Ahmed Shedid began serving as Shedid's caretaker more than a year before receiving the target letter in this case. It is a logical and factual conclusion that Mr. Ahmed Shedid's devotion to his brother's healthcare is a result of his deep sense of obligation and not any attempt to curry favor with the Court or the Government.

    **C.**    **Because combined mitigating circumstances, such as Mr. Ahmed Shedid's circumstances related to loss and the need to assist in his brother's care, make the case an exceptional one, a downward departure should be granted based on U.S.S.G. § 5k2.0(c)**

Under § 5K2.0(c), the Court may aggregate all factors that might not ordinarily be relevant, including Mr. Ahmed Shedid's circumstances, his overstated loss amount, and his status as the co-primary caretaker for his brother, even if it believes they would not be sufficient on their own. The law recognizes that a set of unique factors may combine to present a mitigating circumstance warranting a downward departure. *United States v. Cook*, 938 F. 2d 149, 153 (9th Cir. 1991). Downward departures and alternative sentencing based on similar factors have been upheld on appeal.

13

*U.S. v. Rioux*, 97 F.3d 648 (2d Cir. 1996). In *Rioux*, the Court of Appeals upheld a downward departure of ten points because of the defendant's medical condition and good deeds. *Id.* at 663. Application of the Court's discretion to depart from the Guidelines is warranted here because the unique nature of the case and the defendant's characteristics viewed together are far removed from those contemplated by the Guidelines.

Here, as discussed above, Ahmed Shedid is in an extremely unique circumstance regarding his overstated loss amount, and his need to care for his extremely sick brother is exceptional. Even if these were not factors that warranted a downward departure on their own, which they do, the combination of these circumstances is so extensive and extraordinary that these circumstances combined certainly provide support for a downward departure under § 5K2.0. The Court is well within its discretion to depart from the current range and grant a substantial downward departure that results in a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

**D.**     **Even if the Court determines that the Guidelines do not support a downward departure, a variance from the Guideline range is warranted based on a consideration of the sentencing factors under 18 U.S.C. § 3553(a)**

**1.**     **A variance is justified based on application of the § 3553(a) factors and the directive that a sentence be "sufficient but not greater than necessary"**

Following *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts are not required to impose a sentence within the Guideline range. Instead, the Court should determine a reasonable sentence under a two-step process. *Gall v. United States*, 552 U.S. 38, 49 (2007). First, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* (citing *Rita v. United States*, 551 U.S. 338, 347–48 (2007)). Next, the Court must give "both parties an opportunity to argue for whatever sentence they deem appropriate" and "consider

all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49–50. In doing so, the court "may not presume that the Guidelines range is reasonable." *Id.* In fact, sentencing judges may "place greater reliance" on the section 3553 factors than the Guidelines, particularly in the context of loss-based cases. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 509, 515 (S.D.N.Y. 2006) (noting "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss.").

Thus, although the Guidelines are "the starting point and the initial benchmark," the Court's sentencing inquiry must focus on the section 3553(a) factors and must be grounded in an "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49–50. To that end, the Court must consider the following statutory factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment; (3) the need to afford adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment; (6) the kinds of sentences available; (7) any pertinent policy statements issued by the Sentencing Commission; (8) the need to avoid unwarranted sentence disparities among defendants with similar records; and (9) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

Congress has further instructed that the Court should recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582. With that limitation in mind, and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes of [sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

15

Mr. Ahmed Shedid respectfully asks the Court to exercise its discretion in sentencing, given that the specific, individualized circumstances of this case differ from those envisioned in the Guidelines' more generalized calculation. Here, the § 3553(a) factors overwhelmingly support a substantial variance below the suggested Guideline range of the statutory maximum 60 months. The proposed sentence would satisfy the factors specified in sub-section (1) of 18 U.S.C.A. § 3553(a) and fully comply with the purposes set forth in sub-section (2) of that provision, for multiple independent reasons.

> 2.     § 3553(a)(1): A variance is appropriate based on Mr. Ahmed Shedid's history and characteristics, specifically his role and primary caretaker for his brother

In determining the particular sentence to be imposed, 18 U.S.C. § 3553(a)(1) directs the Court to consider the "history and characteristics of the defendant." There are numerous reasons why a variant sentence is appropriate here.

First, Mr. Ahmed Shedid is a 35-year-old devoted husband and father who has worked hard his entire life. He currently lives with his wife and son, and they are expecting their second child. He balances taking care of his own family with, as discussed at length above, serving as his brother's primary caretaker. The assistance he provides to his family goes well beyond that of a typical husband, brother, or family member. He devotes his days and his resources to his own immediate family and to assisting a brother who is gravely ill and only getting worse. In fact, Mr. Ahmed Shedid's greatest concern is the possibility that he will not be present for his family, including losing his ability to continue to care for a brother whose health is deteriorating rapidly. *See, e.g., United States v. White*, 301 F. Supp. 2d 289, 297 (S.D.N.Y. 2004) (departing eight levels where the court found that extraordinary family circumstances justified a downward departure,

including providing primary support for two children, a critically ill father, and a mother who was a 66-year-old factory worker).

Second, Mr. Ahmed Shedid has admitted wrongdoing, cooperated with the Government within two days of receiving a target letter, and quickly pled guilty after waiving presentment of an indictment in this case. Further, Mr. Ahmed Shedid received no enhancements related to leadership and the conduct to which he pleaded guilty lasted only approximately eight months.

Third, outside of the conduct at issue in this case, Mr. Ahmed Shedid has zero criminal history points. *See United States v. Howe*, 543 F. 3d 128, 133 (3d Cir. 2008) (affirming below guideline sentence based, in part, on finding that defendant guilty of two counts of wire fraud had made an "isolated mistake"); *see also United States v. Rowan*, No. 06-321, 2007 U.S. Dist. LEXIS 2126, at *26-30 (E.D. Pa Jan. 10, 2007) (imposing a below-guidelines sentence for mail fraud conviction based on defendant's history and isolated nature of crime in that history). A variant sentence is appropriate where a defendant has no criminal history. *See United States v. Autery*, 555 F. 3d 864, 874 (9th Cir. 2009).

Prior to the conduct for which he was charged, Mr. Ahmed Shedid took care of his family and achieved significant success through hard work and talent. The aberrational nature of Mr. Ahmed Shedid's criminal behavior and his commitment to family support a variance from the Guidelines. The quality of Mr. Ahmed Shedid's character is demonstrated by the deep remorse he has demonstrated, the incredible shame he bears, and the substantial efforts he made to cooperate and plead guilty. He is, in the eyes of his family, friends and the public, a criminal – something virtually unthinkable to him. Accordingly, an examination of Mr. Ahmed Shedid's history and

characteristics reveals that a sentence of the statutory maximum would be far greater than necessary to achieve the § 3553 sentencing goals; a substantial variance would more adequately accomplish those goals.

### 3.    § 3553(a)(1): A variance is appropriate based on the nature and circumstances of Mr. Ahmed Shedid's offense

Here, this is not a typical loss-based case. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (noting that a defendant's motive and gain are highly relevant at sentencing). Even if the PSR's overstatement of the amount of pills Mr. Ahmed Shedid's ordered did not support a downward departure, it would certainly support a variance based on the nature and circumstances of the offense. *See* 18 U.S.C. § 3553(a)(1). The U.S. Sentencing Commission's background statement on crimes related to trafficking in counterfeit goods notes that "[s]imilar to the sentences for theft and fraud offenses, the sentences for defendants convicted of intellectual property offenses should reflect the nature and magnitude of the *pecuniary harm* caused by their crimes." U.S.S.G. § 2B5.3 (emphasis added). Here, the calculation method required by the Guidelines and adopted in the PSR vastly overstates the losses in two ways that make the current advisory Guideline range run afoul of the Guidelines. First, as discussed previously, Mr. Ahmed Shedid himself is not responsible for any harm caused by the additional pills that were ordered without his or Ibrahim's knowledge. Second, because the pills were seized before they could be placed into any streams of commerce, the vast majority of the loss here – nearly $30 million – stems from a single shipment that caused no pecuniary harm to the intellectual property holder. This further removes this case from the heartland of the harm the Guidelines were attempting to address.

Thus, a substantial variance would be appropriate in this case based solely on the inflated loss amount attributed to Mr. Ahmed Shedid.

4.    **§ 3553(a)(2)(A): A substantial variance reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense**

While the Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), a statutory maximum sentence is not necessary to accomplish that goal. Many Courts have recognized that the collateral consequences of a conviction – especially in a publicized case like this one – can serve as a powerful deterrent to potential criminals. *United States v. Stewart*, 590 F. 3d 93, 141 (2d Cir. 2009) (sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession (internal quotation marks omitted)); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (Court properly considered "atypical punishment such as the loss of [defendant's] reputation"); *United States v. Sachakov*, No. 11-CR-120, 2013 WL 101287, at *3 (E.D.N.Y. Jan. 8, 2013) (fact that defendant was likely to lose medical license relevant to setting appropriate sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

Research on deterrence and criminal sentencing also indicates that, particularly for white collar criminals, "informal sanctions (such as social censure, shame, and loss of respect)" are "equally important [as imprisonment] in producing the deterrent outcome." Zvi S. Gabbay, *Exploring the Limits of the restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007). There is no empirical evidence that lengthy sentences provide an additional deterrent effect. *See id.* (no evidence supporting "the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"); David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted*

*of White Collar Crimes*, 33 Criminology 587 (1995) ("It has often been assumed by scholars and policymakers that white-collar criminals will be particularly affected by imprisonment. Our analyses suggest that this assumption is wrong, at least as regards official reoffending among those convicted of white-collar crimes in the Federal Courts. We find that prison does not have a specific deterrent impact upon the likelihood of rearrest over a 126-month follow-up period."). Sentencing courts have recognized the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514.

A substantial variant sentence, combined with conditions of supervised release to follow, will constitute adequate punishment for Mr. Ahmed Shedid and serve as a forceful, tangible reminder to the community of the seriousness of the offense.

### 5. § 3553(a)(2)(B): A substantial variance affords adequate deterrence to criminal conduct

The immediately preceding discussion addresses this statutory consideration; a substantial variance below the statutory maximum would provide adequate deterrence against future criminal conduct. Mr. Ahmed Shedid has also suffered severe direct and collateral consequences because of this case, including damage to his reputation, substantial financial losses and attorneys' fees, and significant stress and strain on his family. These consequences, while justifiable, are sufficient to deter Mr. Ahmed Shedid from committing any criminal activity in the future. Mr. Ahmed Shedid's experience of being investigated and convicted, and the financial debt incurred in mounting a defense, serve as powerful deterrents.

6.    **§ 3553(a)(2)(C): A substantial variance protects the public from further crimes of the defendant**

Apart from the circumstances giving rise to the instant offense, Mr. Ahmed Shedid has been law-abiding and has complied in an exemplary manner with all conditions of pretrial supervision. As such, there is negligible risk of recidivism, and a harsh sentence is not necessary to accomplish general or specific deterrence. *See United States v. Ocampo*, 633 F. App'x 115, 117 (4th Cir. 2016); *see also United States v. Kim*, No. CR-07-170-S-BLW, 2008 WL 5054584, at *2 (D. Idaho Aug. 29, 2008) (finding, in trademark counterfeiting case, that a below-Guideline sentence was warranted due to defendants' otherwise law-abiding life and low risk of recidivism).

7.    **§ 3553(a)(3): A substantial variance is appropriate given the kinds of sentences available**

This Court has the authority and may exercise its discretion to consider a wide range of alternatives to the term of imprisonment called for under the Guidelines. Mr. Ahmed Shedid is an outstanding candidate for a variance. He is a first-time offender, he has no history of violence, and he is highly motivated to continue aiding his family and to contribute to society.

Section 3553(a)(3) encourages the Court to consider alternative sentencing mechanisms. A variance of Mr. Ahmed Shedid's sentence for the reasons stated herein would be reasonable and would fully comport with the requirement that "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2)." *Booker*, 543 U.S. at 220.

8.    **§ 3553(a)(4): A variance is appropriate given the kinds of sentences and the sentencing range established for the applicable category of offense committed by the defendant as set forth in the Guidelines**

The Guidelines are not mandatory nor should they be presumed reasonable. *Nelson v. United States*, 129 S. Ct. 890, 172 L. Ed. 2d 719 (2009). The Guidelines are just one of many

factors this Court must consider. Mr. Ahmed Shedid's history and family devotion, the nature and circumstances of the offense, the substantial overstatement of loss, and other factors discussed herein provide ample support for this variance.

### 9. § 3553(a)(5): Pertinent policy statements issued by the Sentencing Commission support a substantial variance

As noted previously, pertinent policy statements support a variance given the overstated nature of the calculated losses here. 18 U.S.C. § 3553(a)(5); U.S.S.G. § 2B1.1, App. Note 21(C). Further, the policy statement within § 5H1.6 provides for a downward departure when a defendant faces substantial familial obligations. Additionally, § 5K2.0(c) provides that factors that might not be relevant on their own warrant a departure when they are present in combination and to an exceptional degree.

### 10. § 3553(a)(6): Failure to grant a variance would create unwarranted sentencing disparities

Congress has instructed courts to "avoid unwarranted sentence disparities" among similarly situated defendants and others. 18 U.S.C. § 3553(a)(6). A sentence below the advisory Guideline range would avoid unwarranted sentence disparities among defendants with similar records. *See United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007), *vacated on other grounds by* 552 U.S. 1089 (2008) ("[T]he kind of disparity with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case.").

The PSR notes that, according to the Sentencing Commission, the average length of imprisonment imposed for similarly situated defendants in the last five fiscal years was 39 months and the median length of imprisonment imposed was 36 months. *See* PSR at ¶ 104. Also, *See* **Chart, attached as Ex. C (a).** Thus, the low end of Mr. Ahmed Shedid's advisory Guideline range absent the reduction to the statutory maximum is 31 months higher than the average sentence

(which assumes no benefit for cooperation), and 34 months higher than the median sentence imposed in similarly situated cases. Critically, these averages are nearly half the low end of his current advisory Guideline range even when holding Mr. Ahmed Shedid responsible for the entire loss amount reflected in the PSR.

If he was held accountable for only what he ordered, he would have an approximate offense level of 21 and a criminal history category of I. According to Judiciary Sentencing Information ("JSIN") data,

> [d]uring the last five fiscal years (FY2019-2023), there were 11 defendants whose primary guideline was §2B5.3, with a Final Offense Level of 21 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 10 defendants (91%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 10 month(s) and the median length of imprisonment imposed was 6 month(s). *See* **Chart, attached as Ex. C (b).**

*See* JSIN, U.S. Sentencing Commission, *available at* https://jsin.ussc.gov/analytics. Accordingly, the average sentence for those who moved the amount of counterfeit goods that Mr. Ahmed Shedid actually intended to order was only 10 months. Thus, under any analysis Mr. Ahmed Shedid faces a substantially unwarranted sentence disparity among similar defendants absent a steep variance.

This § 3553(a) factor alone would provide the Court a basis to impose a variance below the advisory Guideline range. When considered in the context of the other § 3553(a) factors Mr. Ahmed Shedid has presented, it further bolsters the request that the Court vary substantially below the current advisory Guideline range.

## IV.     Conclusion

For all the reasons mentioned above, the Court should grant Mr. Ahmed Shedid a substantial downward departure or variance. Such a sentence, combined with the lifetime shame of a felony conviction and such conditions of supervised release as the law requires and the Court deems

23

appropriate, will be in the best interest of justice for the general public, the Government, Mr. Ahmed Shedid, his family, and the community. Here, the significant mitigating factors relating to Mr. Ahmed Shedid's personal, professional, and community background provide compelling support for a sentence far below the statutory maximum called for by the advisory Guideline range.

Additionally, as was previously addressed, the defendant respectfully requests that this Court stagger any terms of confinement of the Shedid brothers so as to allow them to continue to care for their brother, Mr. Shedid Shedid.

Respectfully submitted,


s/ Gregory P. Harris
Gregory P. Harris (#1739)
Harris & Gasser, LLC
1529 Laurel Street
Columbia, South Carolina 29201
(803) 779-7080

s/ J. Strom Thurmond, Jr.
J. Strom Thurmond, Jr. (#7244)
Young & Thurmond, LLC
P.O. Box 651
Aiken, South Carolina 29802
(803) 649-0000

s/ Jonathan S. Altman
Jonathan S. Altman (#5796)
Derfner & Altman, LLC
575 King Street, Suite B
Charleston, South Carolina 29403
(843) 723-9804


February 24, 2025

# Exhibit A



| MEDICAL RECORDS | Shedid, Shedid Fathy |
| 169 Ashley Ave | MRN. 005707092, DOB: ████, Legal Sex: M |
| Suite H102 | Acct # ████ |
| Charleston SC 29425-3490 | Visit date: 12/6/2024 |

MUSC Health
Medical University of South Carolina

## 12/06/2024 - Office Visit in Neurology at Rutledge Tower (continued)

### Visit Information (continued)

| Name | Address | Phone | Fax |
|------|---------|-------|-----|
| Neurology at Rutledge Tower | 135 Rutledge Avenue, 5th Floor Charleston SC 29425 | 843-792-3223 | 843-792-8626 |

### Follow-up and Dispositions

• Return in about 6 months (around 6/6/2025) for Brianna Coulter, PA in person visit IN WEST ASHLEY, 1 YEAR WITH ME .

### Level of Service

| Level of Service |
|---|
| PR OFFICE/OUTPATIENT ESTABLISHED HIGH MDM 40 MIN |
| **Log History** |
| LOS History |

### Progress Notes

| Progress Notes |
|---|
| Gina Susana Perez Giraldo, MD at 12/6/2024 0930 |

### MUSC Neuroimmunology and MS Center New Patient Evaluation

Shedid Fathy Shedid is a 33-year-old man who is referred for further evaluation and management of relapsing remitting MS

Diagnostic History:
Clinical Onset: 12/2016 had diplopia and difficulty walking
Symptoms prior to onset: None
MRI: Several periventricular lesions and brainstem lesions, several spinal cord lesions suggestive of MS
Serology:
CSF: Not available
Other diagnostic testing:

Treatment History:
Copaxone 2016, only took few doses
Rebif 2021: had flu like reactions so only took a few doses
Ozanimod November 2022- December 2023
Rituximab 1 gram 12/19/23
Briumvi 3/2024-current!, last dose 9/9/24

Date of last relapse: Summer 2022 clinically, new enhancing lesion in October 2022

HPI:

• 2016 had diplopia and difficulty walking, MRI at the time had FLAIR hyperintensity with enhancement suggestive of demyelinating disease. He also had several spinal cord lesions with enhancement. He was given Copaxone, which he only took briefly. He says that he did not understand his disease, not think he needed to be on medication.

• After that, he was doing well, normal per his report, would get worse with high temperature. In 2022 he was walking normally per his sister, but I do not have those images for my review.



| | | |
|---|---|---|
| **MUSC Health**<br>Medical University of South Carolina | MEDICAL RECORDS<br>169 Ashley Ave<br>Suite H102<br>Charleston SC 29425-3490 | Shedid, Shedid Fathy<br>MRN: 005707092, DOB: ▓▓▓▓ , Legal Sex: M<br>Acct #: ▓▓▓▓<br>Visit date: 12/6/2024 |

## 12/06/2024 - Office Visit in Neurology at Rutledge Tower (continued)

**Progress Notes (continued)**

- Went to Egypt around June 2022, he then noticed that he got worse, had difficulty walking, could only walk few steps. He was given rebif but this caused significant flu like symptoms that worsened his baseline deficits so he discontinued. He has continued to have deficits ever since, with significant difficulty walking, balance problems and sensory changes.

- Came to the ER, had MRI brain with and without contrast on October 3, 2022 and was found to have one small enhancing lesion in the right internal capsule. It was determined that this lesion was not causing his symptoms, and he will be discharged with outpatient follow-up.

- He now has to use a walker, needs help with feeding, has difficulty holding a paper due to weakness. Has significant difficulty walking, can only walk 2 minutes, cannot walk more than 500 feet. Difficultgy lifting right leg. Weakness is worse in the right side. Given significant deficits, he had to stop working in January 2023

- He saw neurologist in the fall 2022 who started him on ozanimod, which he tolerated, but he run out of the medication. Given his very disabling disease, and the imminent risk of rebound MS while off zeposia, he received IV rituximab in the hospital, and was later transitioned to briumvi, which he started on 3/2024.

Interim 12/6/24-->

Doing good

Stable, no new symptoms

No problems with briumvi, infusion tolerated

No infections

Now that the weather is cold, he seems better, can move better

Continues to exercise at home

**Neuro ROS:**
Vision:blurry vision
Brainstem: can get diplopia, better with cold weather
Motor: worse weakness in right hemibody, worse in leg
Sensory: right hemibody numbness
Cerebellar: balance problems
Bowel/bladder:no urgency, no incontinence. Does have constipation
Ambulation: able to walk
Falls:Has had several falls, doesn't have good balance
Cognition:memory changes
Mood: okay

**PMHx:**
MS



MEDICAL RECORDS
169 Ashley Ave
Suite H102
Charleston SC 29425-3490

Shedid, Shedid Fathy
MRN: 005707092, DOB: ▮▮▮▮     Legal Sex: M
Acct #: ▮▮▮▮
Visit date: 12/6/2024

## 12/06/2024 - Office Visit in Neurology at Rutledge Tower (continued)

**Progress Notes (continued)**

Vitiligo 2016

**PSHx:**

**FHx:**
No family history of MS

**Social Hx:**
Lives in Charleston, SC
Originally from egypt, has been in the US since 2001
Married, has 2 children,
Unemployed since January 2023 due to deficits, currently applied to disability
**Social History**

Tobacco Use
• Smoking status:          Never
• Smokeless tobacco:       Never
Substance Use Topics
• Alcohol use:             No
• Drug use:                No

**Medications:**

Outpatient and Clinic Administered Medications

| | | |
|---|---|---|
| cholecalciferol-vitamin D3 (Vitamin D3) 50 mcg (2,000 unit) tablet | 2,000 Units, Oral, Daily | ✐ Ċ ✕ ✹ |
| dalfampridine (Ampyra) 10 mg 12 hr extended release tablet | 10 mg, Oral, Every 12 hours scheduled | ✐ Ċ ✕ ✹ |
| ozanimod (Zeposia) 0.92 mg Capsule | 1 tablet, Oral, Daily | ✐ Ċ ✕ ✹ |

**Allergies:**
**Review of patient's allergies indicates:**
Allergen                                      Reactions
• Pork/porcine containing products
   *Due to religion.*

**Vitals:**
Vitals:

|  | 12/06/24 0832 |
|---|---|
| BP: | 95/66 |
| Pulse: | 88 |
| SpO2: | 98% |
| Weight: | 77.1 kg (170 lb) |
| Height: | 167.6 cm (5' 6") |



| MEDICAL RECORDS | Shedid, Shedid Fathy |
| 169 Ashley Ave | MRN: 005707092, DOB: ▮▮▮ Legal Sex: M |
| Suite H102 | Acct #: ▮▮▮▮▮▮ |
| Charleston SC 29425-3490 | Visit date: 12/6/2024 |

**12/06/2024 - Office Visit in Neurology at Rutledge Tower (continued)**

**Progress Notes (continued)**

**General Exam:**
The patient is a well appearing male sitting comfortably, no evidence of distress. Skin is notable for no rash. There is no pedal edema. .

**Neurologic Exam:**

Cognition: The patient is awake, alert, fully oriented and able to provide details of history. Language is fluent and prosodic. Short and long-term memory are intact.

Vision: Pupils symmetric and reactive. Fields full.

Brainstem: EOM with loss of smooth saccades. V1-3 intact bilaterally. Face symmetric. Hearing intact. Palatal rise intact. Shoulder shrug intact. Tongue protrudes midline.

Motor:

RUE: deltoid 5/5, biceps 4/5, triceps 4/5, wrist extension 38/5, finger extensors, finger abductors/adductors 3/5

LUE: deltoid, biceps, triceps, wrist extension, finger extensors, finger abductors/adductors 5/5

RLE: hip flexor 2/5, can briefly lift against gravity, knee extension 3/5, knee flexion 3/5, dorsiflexion 2/5

LLE: hip flexor 5/5, knee extension 5/5, knee flexion 5/5, dorsiflexion 5/5

Reflexes 2+ throughout

Sensory: Decreased pin in right hemibody (arm and leg), decreased to vibration in both legs, more in right. Normal proprioception

Romberg positive

Cerebellar: N difficulty with finger-to-nose bilaterally, worse in the right. Unable to test HTS due to weakness

Ambulation:walking better today, with AFO in right foot. Ataxic, walks with walker

**Diagnostic Studies:**

Imaging:

MRI brain with a nd without contrast 10/3/22:

# Exhibit B

# Forensic Interviewing and Consulting Services, LLC
340 Dutchman Shores Circle
Chapin, SC 29036
803.360.8601

Paul R. Thurmond
Thurmond Kirchner & Timbes, P.A.
15 Middle Atlantic Wharf
Charleston, SC  29401

RE: Ibrahim Shedid

Dear Mr. Thurmond:

At your request, a Polygraph Examination was administered to Ibrahim Shedid, DOB: ▮▮▮▮
▮▮▮, in Charleston, South Carolina on June 28, 2024. Before the Polygraph examination was administered, Mr. Shedid read and signed a consent form outlining the reason for the test and assuring all concerned that the examination was being taken voluntarily, and to whom all information, findings, and examination data would be subsequently disseminated to.

Before commencing the active testing of this examination, a verbal pretest interview was conducted to summarize the examinee's personal and case history, explain the polygraph components and related physiological processes, debrief the examinee of any information regarding the issues and circumstances under investigation, and thoroughly review the test questions. During the pretest interview, the examinee appeared to be physically and medically suitable to take a polygraph examination. The examinee also appeared to be lucid and rational during the pretest interview.

The Utah Comparison Question test format (Raskin Technique) was utilized throughout the examination, using sensors that recorded, on a computerized moving chart, relative changes in blood pressure, rate and strength of pulse beat, electro dermal response, and thoracic and abdominal breathing patterns. The physiological reactions on the polygraph charts were analyzed, quantified, and evaluated utilizing the Empirical Scoring System, Multinomial (ESS-M), an evidence-based, norm-referenced, standardized protocol for polygraph test data analysis.

PRIVILEGED AND CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

RE: Ibrahim Shedid

DOB: ▮▮▮▮▮▮

Five polygraph charts and an Acquaintance test were conducted during this examination. The following relevant questions were utilized:

**Preparatory/Sacrifice Relevant Question:**
**SA. Regarding whether you ordered more than thirty thousand counterfeit Viagra pills in January of this year, do you intend to answer my questions truthfully?**

**Relevant Questions Quantified and Used for Determination:**
**R1. Did you order more than one thousand bottles of that counterfeit Viagra?**
**R2. In January of 2024, did you order more than one thousand bottles of that counterfeit Viagra?**
**R3. At any time, did you order more than thirty thousand counterfeit Viagra pills?**
**R4. In January of this year, did you order more than thirty thousand counterfeit Viagra pills?**

Mr. Shedid answered in the affirmative to the Sacrifice Question and in the negative to Relevant Questions 1, 2, 3, and 4, on all five charts.

*Conclusion:*
        In the opinion of the undersigned, Ibrahim Shedid's polygraph charts showed **No Deception Indicated** to the above listed relevant questions. Careful analysis and quantification of his polygraph charts revealed a Grand Total score of Plus 24.  A minimum Grand Total score of plus 3 or greater is required before a definite truthful conclusion can be rendered. A minimum Grand Total score of minus 3 or less is required before a definite conclusion of deception can be rendered. Therefore, it is the opinion of the undersigned, that Mr. Shedid was **Truthful** when he answered the relevant test questions.

Sincerely,

Tim Stephenson, CFLEPE, CFI
SC License# 22



**Palmetto Truth Solutions, LLC**
3534 Old Ferry Rd.
John's Island, SC 29455

## POLYGRAPH EXAMINATION QUALITY CONTROL
### CONFIDENTIAL and PRIVELEGED

| CASE INFORMATION |
| --- |
| QC Reviewer:  Tony L. Winstead |
| Date of Review: June 28, 2024 |
| Examinee:  Ibrahim Shedid |
| Test Format:  Utah 4 RQ |
| Scoring Method Used: ESS-M |
| Final QC Conclusion: NDI |

### INTERVIEW SYNOPSIS

On the above date, I conducted Test Data Analysis for Quality Control purposes on the above referenced Polygraph Examination.

The polygraph charts and physiological reactions were analyzed, quantified, and evaluated utilizing the Empirical Scoring System - Multinomial (ESS-M), an evidence-based, standardized, and norm-referenced protocol for polygraph test data analysis.

After reviewing a total of 5 charts, it is this Examiner's opinion, that the ESS-M test scoring protocols supported a conclusion of:

### NO DECEPTION INDICATED

Respectfully submitted,

*Tony L. Winstead*

Tony L. Winstead
SC License# 79

# Exhibit C

(a) 



*According to the Sentencing Commission, even if Mr. Ahmed Shedid were held accountable for all the pills – including those he never intended to order – the average sentence for a similarly situated defendant was 39 months.*

(b)



*According to the Sentencing Commission, if Mr. Ahmed Shedid were held accountable for only what his brother Ibrahim ordered or intended to order, the average sentence for a similarly situated defendant was 10 months.*