IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: 2:24-cr-764 |
| v. | |
| IBRAHIM FATHY SHEDID | **GOVERNMENT'S SENTENCING MEMORANDUM** |

On October 30, 2024, Defendant Ibrahim Fathy Shedid ("Ibrahim and/or Defendant") pled guilty to a one-count Information charging him with conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. § 371. The United States submits this memorandum in advance of Ibrahim's sentencing. The United States Probation Office ("USPO"), in its Presentence Report ("PSR"), determined that the total offense level for Ibrahim is 27, which results in a guideline range of 70 to 87, which was reduced to the statutory maximum of 60 months. PSR ¶ 79.

In the Defendant's sentencing memorandum, he incorporates his co-Defendant and brother's sentencing memorandum and sets forth that he and Ahmed are "identically situated." *See* ECF No. 57, pg. 2. As will be set forth herein, as it relates to the offense of conviction, the Government believes the two brothers, while unequivocally co-conspirators, were not identically situated in the scheme.

There are no objections to the PSR, but the Defendant has requested this Court grant him a "substantial" variance or departure. Relying primarily on what the Defendant believes is an inflated loss amount for the guidelines calculation, the Defendant asks for a departure and/or variance ranging from six to eight levels. *See* ECF No. 57, Ex. 1 pg. 10. The Government does not believe a departure or variance is warranted. Further, as will be discussed in more detail below, the Government believes that an evaluation of the 18 U.S.C. § 3553(a) factors support a significant period of incarceration and that the statutory maximum would not be "greater than necessary." However, should this Court deem

1

some sort of variance is appropriate, the Government would respectfully ask that this Court vary less than the Defendant is requesting.

I.   BACKGROUND.

In September 2024, Ibrahim was charged in a one-count Information charging him, and his brother Ahmed Fathy Shedid, with conspiracy to traffic counterfeit goods. *See* ECF No. 1. In October 2024, Ibrahim pled guilty to the Information pursuant to a written plea agreement. *See* ECF No. 23.

The facts giving rise to the Information pertain to Ibrahim and his brother's involvement in a conspiracy to traffic counterfeit goods, specifically counterfeit pharmaceuticals, which is a violation of 18 U.S.C. § 2320(a)(1). The investigation began with A2Z warehouse, which was associated Ahmed and Ibrahim, and the suspicion that various counterfeit products may be being sold out the warehouse.[1] As the investigation continued, Big Boss Puff and Stuff, LLC ("Big Boss") was also revealed to be associated with Ibrahim, and it was believed that counterfeit pharmaceuticals, and other products, were likely being sold out of Big Boss. PSR ¶ 21.

In January 2024, after the initial investigation into Ahmed, Ibrahim, A2Z, and Big Boss was underway, HSI was contacted by UPS about a possible shipment of illicit items that was intended for Big Boss. PSR ¶ 24. One of the boxes in the shipment had broken open and pill bottles, purporting to be Viagra, were observed. The boxes were being shipped from New Jersey and the intended recipient was "James Bond," and the address was associated with Big Boss. PSR ¶ 24. Agents with HSI contacted Viatris, who is the parent company for Viagra, and it was confirmed that the pills were counterfeit. PSR ¶ 25.

---

[1] While HSI was investigating the counterfeit pharmaceuticals, the South Carolina Law Enforcement Division ("SLED") was involved in a state investigation pertaining to other products associated with Ahmed, Ibrahim, and A2Z. The Defendants have also pled guilty to this conduct, which is set forth in more detail below and referenced in paragraphs 43-44 of the PSR.

HSI executed a federal search warrant on January 26, 2024, at Big Boss in conjunction with a controlled delivery. In addition to the counterfeit Viagra that was seized as part of the UPS shipment, additional Viagra bottles were located at Big Boss.[2] As the PSR sets forth, the retail value of the counterfeit Viagra that was part of the UPS shipment was in excess of $24 million. *See* PSR ¶¶ 25, 27.[3]

Once the shipment was intercepted, HSI continued its investigation. The PSR does an excellent job of outlining the series of events that took place after the January 2024 seizure. *See* ¶¶ 28-34. Federal agents observed Ibrahim, Ahmed, and individuals associated with them, moving merchandise from the A2Z to a storage unit, and, ultimately, additional search warrants were executed at A2Z and a storage unit associated with Ahmed and Ibrahim where additional counterfeit Viagra was seized that had a retail value in excess of $700,000.[4] *See* PSR ¶¶ 29, 32.

The counterfeit Viagra that was being distributed by Ibrahim and his brother was making its way into various stores, to include convenience stores, in the greater Charleston area. *See* PSR ¶¶ 19-20. By way of example, through the course of the investigation, an inspection was being conducted a convenience store located in Charleston, South Carolina and Viagra 100 mg tablets were discovered. During the interview with the store owner's nephew, he informed law enforcement that "The Warehouse," which was A2Z, supplied the Viagra and each bottle was purchased for $50. PSR ¶ 19.

---

[2] As the PSR sets forth in paragraph 26, in addition to the counterfeit Viagra, additional items were seized, to include various honey products. The Defendants have agreed to forfeit their interest in the various honey products that were ultimately seized during the investigation, which is evidenced in Attachment A to the Plea Agreement. *See* ECF No. 5.

[3] In his brother's sentencing memorandum that the Defendant incorporated as an exhibit to his memorandum, it is mentioned that the UPS order was never delivered. *See* ECF No. 57, Ex. 1 pg. 7. This was because law enforcement was involved. One box was delivered as part of the controlled delivery and the subsequent search warrant.

[4] Like the first seizure, in addition to the Viagra, additional items were seized, to include various honey products. The Defendants have agreed to forfeit their interest in the various honey products that were ultimately seized during the investigation, which is evidenced in Attachment A to the Plea Agreement. *See* ECF No. 5. Items were also seized that were relevant to the state charges and guilty pleas further discussed herein.

Through the course of the investigation, a total of 10,202 bottles of counterfeit Viagra were seized, which is worth $25,584,130.85. PSR ¶ 35.

## II.  A DOWNWARD DEPARTURE IS NOT APPROPRIATE IN THIS CASE.

As set forth in the Defendant's sentencing memorandum, he incorporated all the arguments raised by his co-Defendant and brother, Ahmed, in his sentencing memorandum. Based on this, the Government believes the Defendant is raising three arguments for a departure. First, the Defendant argues that the loss amount is inflated and, as a result, a departure is warranted. Second, the Defendant argues that pursuant to U.S.S.G. § 5H1.6 a departure is warranted because of the care that Ibrahim provides for his brother. Finally, the Defendant argues that pursuant to U.S.S.G. § 5K2.0(c), the combined circumstances warrant a departure. The Government, respectfully, disagrees and does not believe the guidelines support a departure.

  i.  <u>A departure is not warranted based on U.S.S.G. § 2B1.1, n. 21(C).</u>

The Defendant first argues that pursuant to the application notes of § 2B1.1, a departure is warranted because the guideline for the offense level substantially overstates the seriousness of the offense. *See* U.S.S.G. § 2B1.1, n. 21(C). Here, there has been no objection to the loss enhancement applied to the Defendant's offense. Notably, the basis for the Defendant's argument is his polygraph wherein it was determined that he did not lie when asked about the quantity of Viagra he was expecting in January 2024. What we know, though, is that there were 20 boxes of Viagra that were intended to be delivered to Big Boss in January 2024. When the search warrant was executed, the employee working at Big Boss identified Ibrahim as the owner of Big Boss and was on the phone with him at the time of the delivery. *See* PSR ¶ 26. Further, the Defendant pled guilty to the instant offense and during his plea colloquy admitted the retail value of the counterfeit Viagra and agreed that the 20 boxes were intended for Big Boss.

4

The Defendant cites a handful of cases that stand for the proposition that the intended loss overstated the offense and, as a result, those courts granted a departure. *See* ECF No. 57, Ex. 1 pgs. 9-10. In the present case, unlike the circumstances in *Kalili* where the bank was able to stop funds from leaving a bank account, we are not in the universe of intended loss. *See United States v. Kalili*, 100 F. App'x 903, 904 (4th Cir. 2004). The Defendants are being held accountable for tangible counterfeit Viagra that was seized from premises associated with them. As a result, the Government respectfully disagrees that the polygraph and the intent of the Defendants warrant a departure under the guidelines and would ask that this Court not depart to a lower sentence based on this initial argument raised by the Defendant.

    ii.    <u>A departure if not warranted based on U.S.S.G § 5H1.6</u>.

The Defendant's second argument for a departure is based on his role as co-caretaker for his brother Shedid Fathy Shedid ("Shedid"). At the outset, the Government certainly has empathy for the Defendant and his ill brother. That being said, and as this Court is certainly aware, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. 5H1.6. The Defendants have pled guilty to serious offenses and their brother's unfortunate medical condition does not support a departure.

    iii.    <u>A departure is not warranted based on U.S.S.G. § 5K2.0(c)</u>.

The last argument the Defendant raises to support a departure is based on U.S.S.G. § 5K2.0(c), which states a departure may be appropriate based on multiple circumstances. Here, for the reasons set forth herein, the Government does not believe the circumstances raised by the Defendant support a departure. The guidelines were appropriately calculated and a departure below them, here the 60-month statutory maximum, is not appropriate.

5

**III.   THE GOVERNMENT BELIEVES THAT A SENTENCE OF 60-MONTHS, AFTER AN EVALUATION OF THE STANDARDS SET FORTH IN 18 U.S.C. § 3553(a), WOULD NOT BE GREATER THAN NECESSARY; HOWEVER, SHOULD THIS COURT DEEM A VARIANCE IS APPROPRIATE, IT SHOULD NOT BE AS SUBSTANTIAL AS THE DEFENDANT IS REQUESTING.**

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[5] In order to determine the "particular" sentence to impose, the Court must consider the familiar statutory factors listed in §3553(a)(1)-(7). Two of the statutory factors that the Court must consider are (1) the advisory guidelines range set by the Sentencing Commission and (2) the Commission's policy statements are factors to be considered. *See* §3553(a)(4) and (a)(5). Further, the Advisory sentencing guidelines "should be the starting point and the initial benchmark" in determining the appropriate sentence. *See Gall v. United States*, 522 U.S. 38 (2007).

The Defendant and his brother have pled guilty to a serious offense – through their retail establishments, the Defendants were putting counterfeit drugs into the stream of commerce. As discussed below, after consideration of each § 3553(a) factor, a period of 60-months incarceration would not be greater than necessary. However, even if consideration is given by way of a variance to the Defendant based on the arguments he raised in his memorandum,[6] the Government would set forth that the § 3553(a) factors do not support as substantial of a variance as the Defendant is requesting.

---

[5] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

[6] When the Government references arguments raised by Ibrahim in "his memorandum," it is referring to Exhibit 1, which incorporates his co-Defendant and brother Ahmed's sentencing memorandum.

6

A.     **Nature of Offense and History and Characteristics of Defendant – § 3553(a)(1).**

*Nature of the Offense*

The offense that Ibrahim has pled guilty to is a serious offense. Selling any sort of counterfeit product is a violation of federal law and should be punished; however, the selling of counterfeit drugs is more egregious because there are serious safety concerns. As set forth by Viatris in its victim impact statement, "counterfeit pharmaceuticals pose a grave risk to public health and safety." In fact, the federal guidelines recognize this and apply a two-point enhancement when counterfeit offenses involve drugs. *See* PSR ¶ 52.

In Ibrahim's sentencing memorandum, he sets forth that the PSR grossly overstates his actual culpability for the offense and asks for a "substantial" variance".[7] The primary basis for this argument is that the amount of counterfeit Viagra Ibrahim and his brother are being held accountable was for more Viagra than they intended to receive.

At the outset, the Defendant argues that he never ordered more than 1,000 bottles of counterfeit Viagra, including what was seized that was already in Ibrahim and Ahmed's possession pre-January 2024 delivery. The Defendant calculates that if only 1,000 bottles were ordered, the resulting loss would be between $1.5 and $3.5 million, which would result in a loss enhancement of +16. Should the lower loss enhancement apply, the Defendant's total offense level would be a 21, which would result in a guideline range of 37 to 46 months.

The Defendant also sets forth that this case is not a typical "loss-based" case. The Defendant further states that since the counterfeit pills were not placed into the stream of commerce, there was

---

[7] In making this argument, the Defendant cites a 3rd Circuit case of *United States vs. Kirschner*, 995 F.3d 327, 336 (3d Cir. 2021) to support his position. At the outset, this is not binding precedent on this Court and the guidelines have not been objected to. The Government has reviewed Ibrahim's polygraph and certainly does not seek to question his truthfulness but would note for the purposes of this memorandum that it has not been able to corroborate this information, and the only evidence is that the entire 20-box shipment was intended for Big Boss.

no harm to the intellectual property holder. As the PSR sets forth, and what the Government learned from its investigation, the Defendants *were* putting these counterfeit drugs into the stream of commerce and, as a result, harming the intellectual property holder. *See* PSR ¶¶ 19-20. Fortunately, federal agents were able to intercept the large shipment in January 2024 to prevent those pills from being introduced into the stream of commerce.

The Government respectfully does not believe the Defendant's stream of commerce argument supports a variance. Moreover, the arguments posed by the Defendant relating to loss amount are based on a polygraph he took. Ibrahim was polygraphed because the investigation revealed that he was the responsible for ordering the counterfeit Viagra that was being placed in Big Boss and A2Z. While the Government has made efforts to locate who supplied the bottles and confirm Ibrahim's position, it has not been successful. As of this sentencing, what we know is that 20 UPS boxes were going to be delivered to Big Boss.

Should the Court believe a variance is appropriate based on the arguments raised by the Defendant, the Government would ask this court to not vary as substantially as the Defendant is requesting. This is a serious offense, and when the totality of the circumstances are evaluated, including the offenses the Defendant has pled guilty to in state court, a variance as low as the Defendant is requesting does not comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

### *History and Characteristics of the Defendant*

Although Ibrahim did not have a criminal history until he entered his guilty plea for the instant offense, and the state offenses, which in some instances could favor a lesser period of incarceration, he has been given credit for this in his PSR. *See* PSR ¶ 60 (applying zero-point offender adjustment).

Moreover, as outlined in the PSR, the Defendant has pled guilty in state court to two serious offenses. Specifically, possession with intent to distribute marijuana and possession with intent to distribute Delta 8 THC, which is a controlled substance. *See* PSR ¶¶ 43-44. These offenses were

8

considered relevant conduct to the instant offenses. *See* PSR ¶¶ 42-43.[8] Ibrahim was sentenced to 1 day of time served for these offenses. The undersigned AUSA has been in contact with the state Assistant Solicitor prosecuting the case, and she recommended a time-served sentence based on the amount of time Ibrahim was facing on his federal charges. Put another way, Ibrahim will not receive additional punishment from the state for the state offenses he pled guilty to, which further warrants a severe federal punishment.

The Government does not dispute that the Defendant quickly hired counsel and began cooperating upon learning of the federal investigation. To account for the Defendant's cooperation, the Government pled the Defendant to an offense with a five-year statutory maximum.

Notwithstanding the Defendant's lack of criminal history and his conduct once he began aware of the investigation, the crime that the Defendant has pled guilty to is a serious offense that favors a significant sentence.

> **B.     Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, and Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant – § 3553(a)(2)(A)-(C).**

Economic crimes and white-collar offenses must be met with sentences commensurate with the seriousness of the crimes themselves. Any sentence less than a significant period of incarceration would promote a lack of respect for the law. Concern that "white-collar offenders … frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the United States Sentencing Guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. Moreover, a sentence that involves a significant

---

[8] Given that it would have been difficult to determine the guidelines for these offenses, and the fact that the guidelines on the instant offense were in excess of the statutory max, there were no additional points assessed. Moreover, by considering them relevant conduct, the Defendant did not lose credit for being a zero-point offender.

period of incarceration addresses the deterrence factor, which is so critical in fraud, counterfeit, and corruption cases.

Here, a severe sentence is necessary to promote respect for the law and provide deterrence. As set forth by Viatris in its victim impact statement, the "risks [of counterfeit pharmaceuticals] cannot be overstated. Moreover, a simple search on the internet about the risk of counterfeit pharmaceuticals brings you to many websites, including the FDA and the National Institute of Health, who have articles about the harm these counterfeit pharmaceuticals can cause. The Government believes a significant sentence is not only appropriate but necessary to address the purposes of sentencing set forth in § 3553(a)(2)(A)-(C) and would ask this Court to impose a 60-month sentence or, in the alternative, not vary to the degree the Defendant is requesting.

      **C.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct – § 3553(a)(6).**

Congress has directed sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." 18 U.S.C. § 3553(a)(6). "[T]he kind of disparity with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case." *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007), *vacated on other grounds* by 552 U.S. 1089 (2008) (internal quotation marks omitted). Thus, the Court is tasked with evaluating sentencing disparities nationwide, rather than between co-defendants. *See id*. "The Guidelines' goal of national sentencing uniformity is not aimed only at the particular criminal conduct that co-conspirators may share, but also addresses other factors that often vary between co-conspirators like acceptance of responsibility and assistance to the government." *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996).

In the present case, the Defendant relies on the JSIN data set forth in the PSR in making his

10

disparity argument. While that information is certainly useful as a guide to this Court, the Court must look at the individualized circumstances in this case. What we know is that the Defendant was ordering counterfeit Viagra and once received, it, and other products that were contemplated by the state plea, were introduced into the stream of commerce through A2Z Warehouse and Big Boss. When the totality of the circumstances are evaluated, a sentence of 60 months, or certainly a sentence in excess of 37 months, would not create an unwarranted disparity.

    **D.**    **The need to Provide Restitution – § 3553(a)(7).**

The Court has received a victim impact statement from Viatris. Certainly, there is a financial and reputational harm to Viatris that this offense has impacted, and an order of restitution is appropriate under the MVRA. *See* PSR ¶ 99.

**IV.**    **CONCLUSION.**

For the reasons set forth herein, the Government believes a departure is not warranted. Further, evaluation of the § 3553(a) factors support a sentence of 60 months; however, should this Court determine a variance is appropriate, the Government would ask that the Court not vary as substantially as the Defendant is requesting.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

                    RESPECTFULLY SUBMITTED,

                    BROOK B. ANDREWS
                    ACTING UNITED STATES ATTORNEY


BY: <u>/s/ *Amy Bower*</u>
      Amy F. Bower (Fed. Id. 11784)
      Assistant U.S. Attorney
      151 Meeting Street, Suite 200
      Charleston, South Carolina 29401
      (843) 727-4381
      Amy.Bower@usdoj.gov

February 28, 2025
Charleston, South Carolina